## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| CITY OF BROCKTON, | ) | |
| MASSACHUSETTS, | ) | |
| | ) | |
| Defendant. | ) | |

### COMPLAINT

Plaintiff, the United States of America, by the authority of the Attorney General, through its undersigned attorneys, and at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), alleges:

### INTRODUCTION

1.     This is a civil action brought against the City of Brockton, Massachusetts, ("Brockton" or the "Defendant") pursuant to Sections 309(b) and (d) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1319(b) and (d).

2.     The claims arise from the Defendant's failure to comply with the CWA in the operation of its publicly-owned system to collect and treat sanitary sewage and industrial wastes.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

4.     Venue is proper in this district pursuant to Section 309(b) of the CWA, 33 U.S.C.

§ 1319(b), and pursuant to 28 U.S.C. §§ 1391(b) and (c), and 28 U.S.C. § 1395.

## DEFENDANT

5.      Brockton is a political subdivision of the Commonwealth of Massachusetts, and, therefore, a "municipality" within the meaning of Section 502(4) of the CWA, 33 U.S.C. § 1362(4), and "person" within the meaning of Section 502(5) of the CWA, 33 U.S.C. § 1362(5). Section 309(e) of the CWA, 33 U.S.C. 1319(e) provides that whenever a municipality is a party to a civil action brought by the United States under Section 309, the State in which the municipality is located shall be joined as a party.  The Commonwealth of Massachusetts has indicated its intent to intervene as a plaintiff in this action for purposes of Section 309(e) of the CWA, 33 U.S.C. 1319(e).  The United States reserves all claims which it may have against the Commonwealth of Massachusetts under Section 309 of the CWA, 33 U.S.C. 1319(e).

6.      Brockton is the owner and operator of a sanitary sewerage system, including a "publicly owned treatment works" ("POTW"), from which it discharges wastewater containing "pollutants," as defined in Sections 502(6) and (12) of the CWA, 33 U.S.C. §§1362(6) and (12), from "point sources," as defined in Section 502(14) of the CWA, 33 U.S.C. §1362(14), to the Salisbury Plain River, "a navigable water of the United States," as defined in Section 502(7) of the CWA, 33 U.S.C.§1362(7).

## NPDES PERMIT

7.      Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into navigable waters of the United States except in compliance with the terms and conditions of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

8.      Section 402 of the CWA, 33 U.S.C. § 1342, establishes the NPDES permit

program, and authorizes the Administrator of EPA to issue permits for the discharge of pollutants into navigable waters.

9.      Brockton discharges pollutants to navigable waters pursuant to NPDES Permit No. MA0101010.  EPA had issued a NPDES Permit to Brockton on September 26, 1994 (the "1994 Permit").  EPA subsequently re-issued a NPDES Permit to Brockton on September 30, 1999, effective 30 days thereafter (the "1999 Permit").   On May 11, 2005 EPA again re-issued a NPDES Permit to Brockton (the "2005 Permit").  On May 28, 2005, Timothy A. Watts and Douglas H. Watts, citizens of the City of Brockton, filed an appeal of the 2005 Permit.   This permit appeal is currently pending before EPA's Environmental Appeals Board ("EAB").  As a result of the pending permit appeal, the terms and conditions of the 2005 Permit are stayed and the terms and conditions of the 1999 Permit remained in effect.

10.     The Defendant has consistently violated the effluent limitations in the 1994 and 1999 Permits.  For purposes of this action, the United States is only alleging violations of the 1999 Permit as specifically alleged below.

## EPA ADMINISTRATIVE ORDER

11.     In March 2003, EPA issued an Administrative Order to the City to address certain aspects of the City's noncompliance with the terms of its NPDES permit, but did not seek penalties nor require certain actions required to address the City's continuing noncompliance with the effluent discharge limitation requirements of the City's permit.

## FIRST CLAIM

12.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 11 above.

## VIOLATION OF BOD & TSS PERMIT LIMITS

### 1999 Permit - C-BOD and BOD Summer Concentration Effluent Limits

13.     The 1999 Permit requires that, for the period May 1 through October 31,
Carbonaceous Biochemical Oxygen Demand (C-BOD) in the effluent from the POTW shall not
exceed an average monthly concentration of 5 milligrams/liter ("mg/l"), an average weekly
concentration of 8 mg/l, and a maximum daily concentration of 15 mg/l, and that the monthly
removal of Biochemical Oxygen Demand (BOD), based on monthly average values, shall be a
minimum of 85%.

14.     From at least June 2000 to June 2003, the average monthly concentration of C-
BOD in the effluent from the POTW during the period May 1 through October 31 periodically
exceeded 5 mg/l.

15.     From at least June 2000 to August 2002, the average weekly concentration of C-
BOD in the effluent from the POTW during the period May 1 through October 31 periodically
exceeded 8 mg/l.

16.     From at least June 2000 to June 2002, the maximum daily concentration of C-
BOD in the effluent from the POTW during the period May 1 through October 31 periodically
exceeded 15 mg/l.

### 1999 Permit - Summer BOD Mass Effluent Limits

17.     The 1999 Permit requires that, for the period May 1 through October 31, C-BOD
in the effluent from the POTW shall not exceed, among other things, an average monthly mass of
750 pounds/day ("lb/day"), an average weekly mass of 1200 lbs/day, and a maximum daily mass
of 2250 lbs/day.

18.     From June 2000 to August 2003, the average monthly mass of C-BOD in the

effluent from the POTW during the period May 1 through October 31 periodically exceeded 750 lbs/day.

19.     From June 2000 to August 2003, the maximum daily mass of C-BOD in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 2250 lbs/day.

### 1999 Permit - Summer TSS Concentration Effluent Limits

20.     The 1999 Permit requires that, for the period May 1 through October 31, Total Suspended Solids ("TSS") in the effluent from the POTW shall not exceed an average monthly concentration of 5 mg/l, an average weekly concentration of 8 mg/l, and a maximum daily concentration of 15 mg/l, and that the monthly removal of TSS, based on monthly average values, shall be a minimum of 85%.

21.     From June 2000 to August 2003, the average monthly concentration of TSS in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 5 mg/l.

22.     From June 2000 to May 2004, the average weekly concentration of TSS in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 8 mg/l.

23.     From June 2000 to August 2003, the maximum daily concentration of TSS in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 15 mg/l.

24.     For the month of May, 2002, the monthly minimum removal of TSS in the effluent from the POTW periodically was less than 85%.

- 5 -

### 1999 Permit - Summer TSS Mass Effluent Limits

25.     The 1999 Permit requires that, for the period May 1 through October 31, Total Suspended Solids ("TSS") in the effluent from the POTW shall not exceed an average monthly mass of 750 lbs/day, an average weekly mass of 1200 lbs/day, and a maximum daily mass of 2250 lbs/day.

26.     From June 2000 to October 2005, the average monthly mass of TSS in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 750 lbs/day.

27.     From June 2000 to October 2005, the maximum daily mass of TSS in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 2250 lbs/day.

### 1999 Permit - Winter C-BOD and BOD Concentration Effluent Limits

28.     The 1999 Permit requires that, for the period November 1 through April 30, C-BOD in the effluent from the POTW shall not exceed an average monthly concentration of 15 mg/l, an average weekly concentration of 25 mg/l, and a maximum daily concentration of 30 mg/l, and that the monthly removal of BOD, based on monthly average values, shall be a minimum of 85%.

29.     From March 2000 to November 2005, the average monthly concentration of C-BOD in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 15 mg/l.

30.     From March, 2001 to November 2005, the average weekly concentration of C-BOD in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 25 mg/l.

31.     From April, 2000 to November 2005, the maximum daily concentration of C-BOD in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 30 mg/l.

32.     From April, 2000 to April, 2003, the monthly minimum removal of BOD in the effluent from the POTW during the period November 1 through April 30 periodically was less than 85%.

## 1999 Permit - Winter C-BOD Mass Effluent Limits

33.     The 1999 Permit requires that, for the period November 1 through April 30, C-BOD in the effluent from the POTW shall not exceed an average monthly mass of 2250 lbs/day, an average weekly mass of 3750 lbs/day, and a maximum daily mass of 4500 lbs/day.

34.     From April, 2000 to November 2005, the average monthly mass of C-BOD in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 2250 lbs/day.

35.     From April, 2000 to November 2005, the average daily mass of C-BOD in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 4500 lbs/day.

## 1999 Permit - Winter TSS Concentration Effluent Limits

36.     The 1999 Permit requires that, for the period November 1 through April 30, TSS in the effluent from the POTW shall not exceed an average monthly concentration of 15 mg/l, an average weekly concentration of 25 mg/l, and maximum daily concentration of 30 mg/l, and that the monthly removal of TSS, based on monthly average values, shall be a minimum of 85%.

37.     From April, 2000 to December 2003, the average monthly concentration of TSS in the effluent from the POTW during the period November 1 through April 30 periodically

exceeded 15 mg/l.

38.     From April, 2000 to December 2003, the average weekly concentration of TSS in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 25 mg/l.

39.     From April, 2000 to December 2003, the maximum daily concentration of TSS in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 30 mg/l.

40.     From April, 2000 to December 2003, the monthly minimum removal of TSS in the effluent from the POTW during the period November 1 through April 30 periodically was less than 85%.

**1999 Permit - Winter TSS Mass Effluent Limits**

41.     The 1999 Permit requires that, for the period November 1 through April 30, TSS in the effluent from the POTW shall not exceed an average monthly mass of 2250 lbs/day, an average weekly mass of 3750 lbs/day, and a maximum daily mass of 4500 lbs/day.

42.     From March, 2000 to January 2005, the average monthly mass of TSS in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 2250 lbs/day.

43.     From February, 2000 to April, 2005, the daily maximum mass of TSS in the effluent from the POTW during the period November 1 through April 30 periodically exceeded 4500 lbs/day.

44.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the

assessment of civil penalties not to exceed $27,500 per violation per day.

## SECOND CLAIM – TOTAL RESIDUAL CHLORINE EFFLUENT VIOLATIONS

45.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 11 above.

46.     The level of Total Residual Chlorine ("TRC") discharged in the effluent from the POTW for at least the past five years was in excess of the limitations in Brockton's 1999 Permit as specifically set forth in the following paragraphs.

47.     The 1999 Permit requires that TRC in the effluent from the POTW shall not exceed an average monthly concentration of 0.11 mg/l and a maximum daily concentration of 0.19 mg/l.

48.     From April, 2003 to July 2003, the average monthly concentration of TRC in the effluent from the POTW periodically exceeded 0.11 mg/l.

49.     From July, 2002 to October 2005, the maximum daily concentration of TRC in the effluent from the POTW periodically exceeded 0.19 mg/l.

50.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the assessment of civil penalties not to exceed $27,500 per violation per day.

## THIRD CLAIM – FECAL COLIFORM EFFLUENT VIOLATIONS

51.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 11 above.

52.     From April, 2001 to October 2005, the level of Fecal Coliform in the effluent discharged from the POTW was in excess of the limitations in Brockton's 1999 Permit as

specifically set forth in the paragraphs below.

53.     The 1999 Permit requires that Fecal Coliform in the effluent from the POTW shall not exceed an average monthly concentration of 200 colonies/100 milliliter (ml), and a maximum daily concentration of 400 colonies/100 ml.

54.     From May, 2002 to April, 2003, the average monthly concentration of Fecal Coliform in the effluent from the POTW periodically exceeded 200 colonies/100 ml.

55.     From April, 2001 to October 2005, the maximum daily concentration of Fecal Coliform in the effluent from the POTW periodically exceeded 400 colonies/100 ml.

56.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the assessment of civil penalties not to exceed $27,500 per violation per day.

## FOURTH CLAIM
## VIOLATION OF COPPER PERMIT LIMITS

57.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 11 above.

58.     From November, 1999 to December 2005, the level of Copper discharged in the effluent from the POTW was in excess of the limitations in Brockton's 1999 Permit as specifically set forth in the paragraphs below.

59.     The 1999 Permit requires that Copper in the effluent from the POTW shall not exceed an average monthly concentration of 53 micrograms/liter ("ug/l") and a maximum daily concentration of 74 ug/l.

60.     From November, 1999 to December 2005,  the average monthly concentration of Copper in the effluent from the POTW periodically exceeded the 53 ug/l limitation in the 1999

Permit.

61.     From November, 1999 to April 2005, the maximum daily concentration of Copper in the effluent from the POTW periodically exceeded 74 ug/l limitation in the 1999 Permit.

62.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the assessment of civil penalties not to exceed $27,500 per violation per day.

<h3 style="text-align:center">FIFTH CLAIM<br>VIOLATION OF AMMONIA PERMIT LIMITS</h3>

63.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 11 above.

### 1999 Permit - Ammonia Summer Concentration Effluent Limits

64.     The 1999 Permit requires that, for the period June 1 through October 31, Ammonia in the effluent from the POTW shall not exceed an average monthly concentration of 1.0 mg/l, an average weekly concentration of 1.0 mg/l, and a maximum daily concentration of 1.5 mg/l,

65.     From at least June 2001 to October 2003, the average monthly concentration of Ammonia in the effluent from the POTW during the period June 1 through October 31 periodically exceeded 1.0 mg/l.

66.     From at least June 2001 to June 2005, the average weekly concentration of Ammonia in the effluent from the POTW during the period June 1 through October 31 periodically exceeded 1.0 mg/l.

67.     From at least June 2001 to June 2005, the maximum daily concentration of

Ammonia in the effluent from the POTW during the period June 1 through October 31 periodically exceeded 1.5 mg/l.

### 1999 Permit - Summer Ammonia Mass Effluent Limits

68.     The 1999 Permit requires that, for the period May 1 through October 31, C-BOD in the effluent from the POTW shall not exceed, among other things, an average monthly mass of 150 lb/day, an average weekly mass of 150 lbs/day, and a maximum daily mass of 225 lbs/day.

69.     From June 2001 to October 2003, the average monthly mass of Ammonia in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 150 lbs/day.

70.     From June 2001 to June 2005, the maximum daily mass of Ammonia in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 225 lbs/day.

### 1999 Permit - Ammonia Non-Summer Concentration Effluent Limits

71.     The 1999 Permit requires that, for the period May 1 through May 30, Ammonia in the effluent from the POTW shall not exceed an average monthly concentration of 3.2 mg/l.

72.     From at least May 2000 to May 2003, the average monthly concentration of Ammonia in the effluent from the POTW during the period May 1 through May 30 periodically exceeded the non-Summer effluent limits.

73.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the assessment of civil penalties not to exceed $27,500 per violation per day.

## SIXTH CLAIM
## VIOLATION OF PHOSPHORUS PERMIT LIMITS

74.     The United States realleges and incorporates by reference the allegations of paragraphs 1 through 11 above.

75.     The 1999 Permit requires that, for the period May 1 through October 31, Phosphorus in the effluent from the POTW shall not exceed an average monthly concentration of 1.0 mg/l, an average weekly concentration of 1.0 mg/l, and a maximum daily concentration of 1.5 mg/l.

76.     From at least September 2001 to May 2002 the average monthly concentration of Phosphorus in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 1.0 mg/l.

77.     From at least September 2001 to May 2003 the average weekly concentration of Phosphorus in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 1.0 mg/l.

78.     From at least September 2001 to May 2003 the maximum daily concentration of Phosphorus in the effluent from the POTW during the period May 1 through October 31 periodically exceeded 1.5 mg/l.

79.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the assessment of civil penalties not to exceed $27,500 per violation per day.

## VIOLATION OF TOXICITY PERMIT LIMITS

80.     The United States realleges and incorporates by reference the allegations of

paragraphs 1 through 11 above.

81.     The 1999 Permit requires that there be no acute toxicity of the effluent, as measured by the 48 hour *ceriodaphnia* lethal concentration to 50% of the organisms (LC 50) in a sample of 100% effluent.  In addition, the permit requires that there be no chronic toxicity in a sample of 98% effluent.

82.     From at least April 2000 to February 2005 the effluent toxicity of the effluent from the POTW periodically exceeded both the acute and chronic Whole Effluent Toxicity requirement.

83.     Pursuant to Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319(b) and (d), and the Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, for each day of each violation of the Permit and the CWA, Brockton is subject to injunctive relief and the assessment of civil penalties not to exceed $27,500 per violation per day.

## RELIEF SOUGHT

Wherefore, Plaintiff, the United States of America, respectfully requests that the Court grant the following relief:

1.     Enter a permanent injunction requiring the Defendant to:

    a.     Repair and adequately maintain the City's current wastewater treatment facilities pending the construction of the upgraded facilities;

    b.     Design and construct an expanded and upgraded POTW with capacity to adequately and consistently treat the wastewater and extraneous flows that remain after the rehabilitation of the City's collection system;

    c.     Implement the recommendations of prior and ongoing I/I investigations designed to reduce the extraneous flow entering the sanitary sewer system, including further evaluation of private inflow sources;

    d.     Evaluate, design, and construct additional interceptor and pumping capacity necessary to convey wastewater and extraneous flows

- 14 -

that remain after the rehabilitation of the City's collection system;

e.   Establish and implement preventive maintenance programs
     necessary to maintain both the City's wastewater treatment facility and
     collection systems; and

f.   Comply with all terms and conditions of its NPDES permit.

2.   Order Defendant to pay a civil penalty not to exceed twenty-seven thousand five
     hundred dollars ($27,500) for each day of each violation of the Permit, Section
     301 of the CWA, 33 U.S.C. § 1311.

3.   Award the United States all costs and disbursements of this action; and

4.   Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Sue Ellen Wooldridge
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC  20044

MICHAEL J. SULLIVAN
United States Attorney

By: Barbara Healy Smith
Assistant United States Attorney
John Joseph Moakley U.S.  Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3263

Dated: August 2, 2006

- 15 -